**FOREST HILLS EARLY LEARNING CENTER, INC.; Academy Day Care, Inc. and Holloman Child Care Centers, Inc., Appellants,**

v.

**William LUKHARD, Director of Department of Welfare and Institutions of Commonwealth of Virginia, Appellee.**

**Virginia Council of Churches, Amicus Curiae.**

**Christian Law Association, Amicus Curiae.**

No. 82–1679.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1983.

Decided Feb. 7, 1984.

John E. Heintz, Washington, D.C. (John Vanderstar, Steven J. Rosenbaum, Covington & Burling, Washington, D.C., on brief), for appellants.

Dennis G. Merrill, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Va., Richmond, Va., on brief), for appellee.

Don Huffman, Bird, Kinder & Huffman, Roanoke, Va., David C. Gibbs, Jr., Charles E. Craze, Gibbs & Craze Co., L.P.A., Cleve-

land, Ohio, on brief, for amicus curiae Christian Law Ass'n.

Jeffrey S. Berlin, Elliot F. Gerson, Verner, Liipfert, Bernhard, & McPherson, Chartered, Washington, D.C., on brief, for amicus curiae Virginia Council of Churches.

Before WIDENER, PHILLIPS and MURNAGHAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Forest Hills Early Learning Center and several other nonsectarian operators of child care centers[1] appeal a judgment of the district court upholding the constitutionality of Virginia's statutory exemption of religiously affiliated child care centers from the general licensing requirements imposed upon the operation of such centers by the Commonwealth. 540 F.Supp. 1046. The nonsectarian centers brought this action against the responsible state official, challenging the constitutionality of the exemption on the basis that it violated the establishment clause of the first amendment and also denied the nonsectarian centers the equal protection of law.[2] On the parties' cross-motions for summary judgment, the district court granted summary judgment in favor of the state defendant, holding that the exemption had both a secular purpose and primary secular effect and involved a permissible effort by the state to comply with its constitutional obligation to avoid infringement of the sectarian sponsors' rights under the religion clauses.

We conclude that, under the establishment clause, the challenged exemption is facially overbroad as a permissible accommodation to any free exercise rights of the sectarian operators of child care centers.

On this basis, we hold that summary judgment was improperly granted to the defendant. On the same basis, we hold that summary judgment might properly be granted to the nonsectarian plaintiffs on the present record. But we conclude that because of critical inadequacies in that record and the absence as parties of the sectarian center operators, such a disposition would be inconclusive of the underlying, conflicting constitutional claims of the sectarian and nonsectarian operators in respect of the state's regulatory scheme. For this reason, we vacate and remand to allow the sectarian operators, if so disposed, to intervene to press in further proceedings their free exercise claims against the establishment clause claims of plaintiffs. Failing intervention by the sectarian operators under the conditions we express, we direct entry of summary judgment in favor of plaintiffs.

I

The Commonwealth of Virginia has regulated all child care centers since at least 1948 by requiring these centers to meet certain licensing standards. From 1968 to 1979, all persons who operated child care centers, without regard to sectarian or nonsectarian affiliation, were required to comply with the licensing requirements of Va. Code §§ 63.1–195 through 63.1–219 and the regulations promulgated thereunder. An applicant for a license under these provisions was required to submit an application to the Commissioner of the Department of Welfare containing an outline of the center's proposed activities, facilities and services, § 63.1–197; the Commissioner was then required to investigate the applicant's proposal and to inquire into the character,

---

1. In an earlier stage the action was dismissed for plaintiffs' lack of standing, 487 F.Supp. 1378 (E.D.Va.1979). This court held the dismissal on that basis erroneous and remanded for further consideration of the standing issue on an expanded record. *Forest Hills Early Learning Center, Inc. v. Lukhard*, No. 80–1272 (4th Cir. Jan. 9, 1981) (unpublished). No question of standing is now raised.

2. The action is nominally against the named Director of the Department of Welfare of the Commonwealth of Virginia in his official capacity. The complaint seeks a declaration that the exemption is unconstitutional, and injunctive relief compelling general application of the pre-exemption child care licensing provisions to all child care centers irrespective of religious affiliation.

For convenience, we refer hereafter to the defendant as "the state."

reputation and financial responsibility of the applicant, § 63.1–198. The applicant was required to grant the Commissioner reasonable opportunity to inspect its facilities, books and records and to interview its employees and agents. *Id.*

If the Commissioner found that the applicant's operation was reasonably conducive to the welfare of the children it might serve and that the applicant's financial responsibility gave reasonable assurance of continued maintenance of its operation, the Commissioner was to issue a license, § 63.1–199. The Commissioner retained the right to inspect the center and to interview any employee or customer of the center at reasonable times, § 63.1–210. In addition to complying with these statutory requirements, a person seeking a license for operating a center had to comply with regulations drawn up by the State Board of Welfare that prescribe general standards and policies for the operation of child care centers. *See* § 63.1–202.

During the early 1970's, the number of child care centers in Virginia increased significantly to meet the rising demand for outside-the-home child day care. As the number of centers increased, the Virginia Department of Welfare received numerous complaints that many of the centers were providing inadequate facilities, meals and supervision. Based upon an investigation, the Department determined that many centers were sacrificing the best interests of the children in order to maintain financial stability and to offer competitive prices. The Department further determined that many parents never visited a center before they enrolled their children there and that decisions concerning the choice of a center were often made without any parental knowledge or information about the centers.

The Department thereupon concluded that the regulations concerning licensing and operation should be upgraded to insure that the pressures of a competitive marketplace did not intrude upon the well-being of children utilizing the service of a center. In 1976, the State Board promulgated new and more stringent regulations, which are summarized in the margin.[3] These regula-

---

3. The Department of Welfare standards are set forth in their entirety at J.A. 15–82. For convenience, they can be summarized as follows:

Section I of the licensing regulations is the definition section.

Section II, entitled "Licensing Procedures," prescribes the materials that must be filed with an application for a license to operate a child care center. These materials include a statement regarding the sponsorship and organization of the child care center, the person responsible for policy-making, administration and operation, an estimated budget, and similar information.

Section III, entitled "Administration," requires child care centers to have a board of directors that is responsible for its operations. (§ III(A)) Child care centers are required to have sufficient financial resources to provide "desirable quality of service and to meet the needs of children in care" (§ III(B)), and have specified minimum public liability insurance for bodily injury. (§ III(B)(4))

Section IV, entitled "Physical Plant," establishes the physical requirements of the center itself. Among other requirements, the child care center must have kitchen space, eating space, sleeping space, toilet and handwashing facilities, and separate storage space for records and equipment. (§ IV(A)(2)) The building must have twenty-five square feet of indoor play space and seventy-five square feet of outdoor play space per child. (§ IV(C)(1) and (2)) There must be a separate room for isolation of children in case of sickness. (§ IV(A)(4)) Each child must have individual storage space for his clothing and personal items. (§ IV(A)(3)) Child care centers serving infants and toddlers must provide separate areas for those children who can walk or are learning to walk and those children who have not reached that stage of development. (§ IV(A)(3) ("Infant and Toddler Care")) Provision must be made for study space for those school age children who want to study. (§ IV(A)(2) ("School Age Care")) The heat of the building must be maintained between 68° and 72° Farenheit. (§ IV(B)(2)) A separate crib, cot or bed must be provided to each child who is regularly in attendance at naptime or bedtime. (§ IV(D)(2))

Section V, entitled "Personnel," forbids employment at a child care center of a person convicted of child abuse, child neglect, or moral turpitude. The regulation also provides minimum educational requirements for child care supervisors that can be satisfied by either secular or religious formal education, and also permit the substitution of practical work experience for educational requirements. (§ V(B)(4)) Part D of Section V es-

tions imposed substantial requirements on all child care centers in many areas, including space, health, safety, and nutritional standards, child/staff ratios, administrative structure, staff applications, parental participation, recordkeeping, program requirements, financial disclosure, disciplinary practices and others.

These standards were adopted in 1976 and applied to all child care centers, as had been the practice with prior regulations in the area. After the regulations were implemented a number of churches that operated child care centers opined to the Commissioner of the Virginia Department of Welfare, William L. Lukhard, that the new

licensing requirements infringed their right freely to exercise their religious beliefs. In response to these complaints the Virginia legislature enacted Va.Code § 63.1–196.3, which exempts all "[c]hild care center[s] operated or conducted under the auspices of . . . religious institution[s]" from compliance with the licensing requirements of § 63.1–196. Those requirements remain fully applicable to all nonsectarian child care centers, and, by express statutory provision, to any sectarian centers whose sponsors nevertheless elect to be covered. § 63.1–196.3D.

Section 63.1–196.3, set out in the margin,[4] does require the sectarian centers to meet

tablishes the ratio of supervisory staff to children at various age levels.

Section VI, entitled "Cooperative Planning with Parents," requires consultation between the child care centers and parents of enrolled children before admission and during enrollment.

Section VII, entitled "Records," requires records to be maintained for each child of an emergency telephone number, his attendance at the center, and the like.

Section VIII, entitled "Program," establishes minimum nutritional requirements for meals and snacks served at child care centers, as well as program requirements for the various age-levels of children enrolled in the child care centers.

Section IX, entitled "Health Standards," establishes various health standards for licensed child care centers. Each employee and volunteer must pass an annual physical examination. (§ IX(A)(1)) Each child must be examined annually by a physician, and must have had immunizations in accordance with the state's Preschool Entrance Health Examination Brochure. (§ IX(B)(1)) A health inspection of each child must be made daily before admittance. (§ IX(B)(2)) Designated staff must receive consultation at least annually from a doctor, nurse, or health department medical personnel to obtain instruction in screening children. (§ IX(B)(2)(b)) A child may be given nonprescription drugs only with his or her parent's or guardian's written consent and prescription drugs only with such written consent and a doctor's order or prescription label. (§ IX(B)(4)) The child care center must keep cleaning fluids and other harmful household agents locked and out of reach of children. (§ IX(B)(6)) Each child care center must keep a first aid kit, and have at least one staff member with formal first aid training. (§ IX(B)(7))

Section X, entitled "Local Ordinances" requires compliance with local child care ordinances.

4. Section 63.1–196.3 of the Virginia Code states in full:

*Child-care center operated by religious institution exempt from licensure; annual statement and documentary evidence required; enforcement; injunctive relief.* —A. Notwithstanding any other provisions of this chapter, a child-care center operated or conducted under the auspices of a religious institution shall be exempt from licensure as required by § 63.1–196. Such religious institution shall file with the Commissioner of Welfare, prior to beginning any such operation and thereafter annually, a statement of intent to operate a child-care center, certification that the child-care center has disclosed to the parents or guardians of the children in the center the qualifications of the personnel employed therein and documentary evidence that:

1. Such religious institution has tax exempt status as a nonprofit religious institution in accordance with § 501(c) of the Internal Revenue Code of 1954, as amended, or that the real property owned and exclusively occupied by the religious institution is exempt from local taxation.

2. Within the prior ninety days, the local health department and local fire marshal or Office of the State Fire Marshal whichever is appropriate, have inspected the physical facilities of the child-care center and have determined that the facility is in compliance with applicable laws and regulations with regard to food service activities, health and sanitation, water supply, building codes, the Virginia Fire Safety Regulations or the Uniform Statewide Building Code and local fire requirements.

several requirements but, as appears from its text, these requirements are minimal and consist mainly of compliance with generally applicable health and safety standards related to human occupancy and use of physical facilities. In lieu of applying for and securing a license, the sectarian institutions have merely to file with the Commissioner of Welfare an initial and thereafter annual statement of intent to operate a child care center; certify that they have disclosed to all parents or guardians of enrolled children the qualifications of the staff personnel; present documentation of their tax-exempt status and of their compliance with local health and fire ordinances and with certain staff ratio requirements; and make public disclosure of certain aspects of their operations. If an exempt center fails to file the required statement of intent, the Commissioner of Welfare may take "such action as he determines appropriate," including a suit to enjoin its operation. § 63.1–196.3B. If a parent or guardian lodges a complaint with any local welfare, health, or fire department related to an exempt center's failure to comply with generally applicable health and safety regulations, those local agencies may inspect the center's facilities and take "appropriate action as provided by law, including a suit to enjoin the operation of the child-care center." § 63.1–196.3C. These are the only official inspection and enforcement mechanisms provided for the exempt centers. In contrast to the nonsectarian centers, no state level inspection or enforcement mechanisms beyond that related to the filing statement requirement are provided for operation of the exempt centers.

The net effect of the exemption in its new differentiation between sectarian and nonsectarian child care centers can therefore be summarized as follows.

In the critical areas of licensing itself, and of program, insurance, financial resources and management, staff qualification, and internal administration following licensure, the sectarian centers are wholly relieved of official state regulation, while the nonsectarian centers remain subject in all these areas to extensive regulation under standards enforceable by state agency inspection and legal sanctions. In place of the extensive state inspection and enforcement mechanisms which remain available to enforce compliance by the nonsectarian centers with these standards, there has been substituted for the sectarian centers only limited disclosure and certification requirements respecting the qualifications (unspec-

3. The child-care center employs supervisory personnel according to the following ratio of adults to children:

a. One adult to four children from zero to twenty-four months.

b. One adult to ten children from ages twenty-four months to six years.

c. One adult to twenty-five children ages six years and older.

Each person in a supervisory position shall be certified by a practicing physician to be free from any disability which would prevent him from caring for such children as will be under his supervision.

4. The following aspects of the child-care center's operations are described in a written statement provided to the parents or guardians of the children in the center and made available to the general public: physical facilities, enrollment capacity, food services, health requirements for the staff and public liability insurance.

B. If a religious institution operates a child-care center and does not file the statement and documentary evidence required by paragraph A hereof, the Commissioner shall give reasonable notice to such religious institution of the nature of its noncompliance and may thereafter take such action as he determines appropriate, including a suit to enjoin the operation of the child-care center.

C. Any parent or guardian of a child in a child-care center who has reason to believe that a child-care center falling within the provisions of this section is not in compliance with the requirements of paragraph A of this section may report the same to the local department of welfare, the local health department or the local fire marshal, each of which may inspect the child-care center for noncompliance, give reasonable notice to the religious institution, and thereafter may take appropriate action as provided by law, including a suit to enjoin the operation of the child-care center.

D. Nothing in this section shall prohibit a child-care center operated by or conducted under the auspices of a religious institution from obtaining a license pursuant to chapter 10 (§ 63.1–195 et seq.) of Title 63.1 of the Code. (1979, c. 425.)

ified) of its staff personnel, its tax-exempt status, its liability insurance coverage, its current compliance with applicable health and safety laws, and a written description of its physical facilities, enrollment capacity, food service and staff health requirements. Although the disclosure and certification requirement is itself enforceable, no sanctions with respect to the matters required to be disclosed or certified remain for the sectarian centers, as they do with respect to the nonsectarian.

In the general areas of child health and safety, the sectarian centers are relieved of a wide range of special regulatory standards related to nutrition, space, heat, light, ventilation, and physical safety which still apply to the nonsectarian centers and are enforceable against those centers by state level inspection and sanctions. In place of these special standards related to child health and safety there has been substituted for the sectarian centers only those health and safety standards already applicable to the general population through local and state fire, safety, and sanitation codes. In place of the state level inspection and enforcement mechanisms available to enforce compliance by the nonsectarian centers with applicable general and special health and safety standards, there has been substituted for the sectarian centers only the inspection and enforcement powers (presumably already available under general law) of local health, welfare and fire departments, acting on complaints of parents or guardians of affected children.

Reacting to this substantial new differentiation in licensing requirements, standards and enforcement mechanisms, the nonsectarian center plaintiffs brought this action, challenging on constitutional grounds the state's statutory exemption of sectarian sponsored centers. Plaintiffs contended that the exemption violated the establishment clauses of the federal and state constitutions, and the equal protection clause of

the federal constitution. On the parties' cross-motions for summary judgment, the district court upheld the exemption against the establishment clause and equal protection challenges, essentially on the same general ground: that the state's obligation to avoid infringing the free exercise rights of the sectarian center sponsors provided a sufficient "secular purpose" and "primary secular effect" to withstand the establishment clause challenge and a sufficiently "compelling state interest" to withstand the equal protection challenge.

Critical to the district court's decision was its express conclusion that it was irrelevant whether free exercise rights of the sectarian center operators were actually being burdened by the pre-exemption licensing requirements and if so, to what extent. In the court's view, "such is not the question before the Court." J.A. 187. In assessing whether the exemption reflected a justifying "secular legislative purpose," or a "compelling state interest," it sufficed for the court that by means of the exemption "the State hoped to prevent possible litigation of any free exercise claims against the licensing requirements and at the same time to assure the welfare of children in church centers by means which intrude as little as possible upon the activities of the church." J.A. 189. For the district court, "[l]ogic supports the conclusion that if regulations arguably violate the free exercise clause it is justifiable for the State to employ a less intrusive means of regulating the church-run centers." *Id.*

From the district court's resulting grant of summary judgment to defendant and denial of summary judgment to plaintiffs, plaintiffs took this appeal.

## II

This case presents a unique litigation clash between the religion clauses of the first amendment.[5] Though direct clashes

---

5. While the plaintiffs' establishment clause and equal protection challenges are conceptually different, we think that in the final analysis resolution of the issues raised under the two comes to the same thing.

The "equal protection" allegedly denied lies in the disparate treatment accorded the sectarian and nonsectarian centers. Justification for the conceded inequality is sought by the state in a "compelling state interest" in avoiding

between the two are understandably avoided by the courts whenever possible, *see Widmar v. Vincent,* 454 U.S. 263, 273 & n. 13, 102 S.Ct. 269, 276 & n. 13, 70 L.Ed.2d 440 (1981), they are, of course not unprecedented, *see Sherbert v. Verner,* 374 U.S. 398, 413–17, 83 S.Ct. 1790, 1798–01, 10 L.Ed.2d 965 (1963) (Stewart, J., concurring). The uniqueness here has to do with the procedural setting in which this clash—an unavoidable one—occurs. Because the resulting adjudicative difficulty heavily influences the decision we reach, we commence by analyzing the way in which free exercise and establishment clause rights are here brought into conflict.

■ The essence of the matter is simply stated. The "religious institutions" exemption is challenged on the basis that it violates the establishment clause: that in its sphere of operation the exemption impermissibly favors "religion over nonreligion."

*See Walz v. Tax Commission,* 397 U.S. 664, 694, 90 S.Ct. 1409, 1424, 25 L.Ed.2d 697 (1969) (Harlan, J., concurring). As the parties and the district court properly saw, the appropriate standard for assessing this establishment clause challenge is the three-part guideline test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under that analytical test, the challenged legislation fails constitutionally unless it is found to have a secular legislative purpose, to have a primary effect that does not advance or inhibit religion, and to have no potential for fostering excessive governmental entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111. Seeking to justify the statutory exemption under this test, the state has advanced as the "secular purpose" of the exemption the constitutionally compelled or permitted accommodation it makes to the free exercise rights of the exempted institutions.[6]

infringement of free exercise rights of the sectarian operators.

The establishment clause claim is that the same difference of treatment impermissibly favors religion over nonreligion. Justification for the same action as challenged in those terms is sought in the identical avoidance of free exercise rights of the sectarian operators, asserted in this context as a "secular legislative purpose."

Whether analyzed as "secular purpose" or "compelling state interest," the justification therefore turns on the same ultimate inquiry: whether and to what extent the free exercise rights whose protection is asserted as justification for the manifestly disparate treatment did in fact exist.

While it may be as well, where possible, to avoid head-on clashes between the religion clauses, it is not possible here. If plaintiffs' claim is analyzed solely in equal protection terms, the head-on clash is only put over to a later stage in analysis. In assessing the extent to which the state's undeniably compelling interest in accommodating any actual free exercise rights justified the particular accommodation afforded by the challenged exemption, the ultimate constraint on the state's permissible range of accommodation will still be found in the establishment clause's barrier against unduly favoring religion over nonreligion.

In these circumstances, we have confined our analysis to the establishment clause challenge and the issues joined under it.

**6.** The state also asserts, though with less emphasis, that the exemption permissibly accommodates establishment clause rights of the sectarian centers. The basic thrust of this "counter-establishment clause" theory is, apparently, that the pre-exemption licensing requirements, particularly those having to do with inspection and compliance mechanisms, involved "excessive entanglement" of the state with the sectarian centers; that the exemption was therefore justified to avoid this consequence. A type of "negative establishment" by virtue of excessive regulation without corresponding beneficial treatment of religious institutions has undoubtedly been recognized in the religion clause cases. *See Lemon v. Kurtzman,* 403 U.S. at 614–25, 91 S.Ct. at 2112–17; *Walz v. Tax Commission,* 397 U.S. at 674, 90 S.Ct. at 1414. But the contours of "negative establishment" by virtue of "excessive involvement through regulation" are by no means clear. In any event they involve questions of degree that we think are wholly subsumed within the more direct question whether and to what extent free exercise rights of the sectarian operators may have been burdened by the pre-exemption regulatory pattern here in issue. That is to say, we do not see how any "negative establishment clause" rights to be free of "excessively entangling regulation" could be greater than the more directly pertinent rights here asserted to be relieved of the same regulatory burden upon free exercise rights.

For this reason, we confine our analysis to the exemption's justification as a permissible accommodation to free exercise rights.

By this process, constitutional compliance with one of the religion clauses has been advanced in litigation as a justifying "secular purpose" for legislation challenged under the other. An awkwardness results that is both conceptual and practical. Because it bears directly upon the court's ability fairly to adjudicate the conflicting religion clause claims on the summary judgment record we review, we pause to point up the special nature of the difficulty.

In the setting of this case the persons whose free exercise rights are centrally in issue are not parties to the litigation and those rights have not been authoritatively established in any other constitutional adjudication. Rather, the rights of those persons are being indirectly asserted in this litigation by the state, which more commonly in free exercise litigation finds itself on the other side, defending or seeking to enforce legislation challenged by such persons as violative of free exercise rights.[7] The result of a successful defense by the state in this case would therefore be a confirmation by judicial review of a prior legislative accommodation of free exercise rights of persons whose entitlement thereto will never have been put to test in an adversarial adjudicative process in which they were parties with the normal burdens of production and persuasion on disputed factual and legal issues.

To point out this awkwardness is not of course to suggest that persons claiming free exercise rights (or others of constitutional origin) may only have them officially recognized and vindicated by judicial challenges to prior legislative (or executive) action alleged to have violated them. The right to petition government for redress of grievances obviously is not so circumscribed. Neither is it to suggest, in corollary, that only the courts and not the legislative (or executive) branches of government may recognize and extend first instance protection to constitutional rights, including those secured by the religion clauses. Of course the other branches—both federal and state—may and do so. But the action of these other branches is of course then subject to judicial review if the governmental action is later put in constitutional issue in a judicial case or controversy, see *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and therein lies the rub here.

Here, the state's legislative determination that it was constitutionally compelled or, at least, permitted to accommodate free exercise rights, has been put directly in issue by the state's litigation assertion that this provided the "secular legislative purpose" for the challenged exemption.[8] This presents a difficult problem concerning the proper scope and standard of judicial review of the resulting legislative action. For although the issue directly posed is whether under the *Lemon v. Kurtzman* test constitutional compulsion or authority constituted a justifying "secular purpose" for the challenged exemption, the dispositive issue must be the underlying one, indirectly raised, whether and to what extent the free exercise rights accommodated by the exemption did in fact exist. It does not seem possible—without wholly abdicating the judicial review function—to hold the accommodation a valid

---

7. *See,* as specifically illustrative, the following recent cases involving state laws regulating the operation of child care and related services: *Kansas v. Heart Ministries, Inc.,* 227 Kan. 244, 607 P.2d 1102, (enforcement action by state), *appeal dismissed,* 449 U.S. 802, 101 S.Ct. 47, 66 L.Ed.2d 6 (1980); *Tabernacle Baptist Church v. Conrad,* C/A No. 79–149 (D.S.C. Oct. 27, 28, 1980) (unpublished) (action by free exercise claimants to enjoin enforcement).

8. Two different theories respecting the nature of the state's justification are advanced on this appeal.

Taking the most extreme position possible, Christian Law Associates, as *amicus curiae* aligned in interest with the state, apparently contends that total accommodation is compelled by the mere fact that religious institutions are the sponsors of the exempt centers.

The state takes a more cautious position—apparently that accepted by the district court—that because the exempted activities were *arguably* under free exercise protection, the state might permissibly accommodate them as a matter of allowing "play in the joints productive of a benevolent neutrality." *Walz,* 397 U.S. at 669, 90 S.Ct. at 1412.

secular legislative purpose for the exemption except on the basis of an independent judicial determination that free exercise rights justifying the accommodation did in fact exist.

■ Certainly it cannot be the case that merely by asserting such a legislative purpose in litigation the state is entitled to have its legislature's accommodation to assumed free exercise rights confirmed by the courts without any judicial inquiry into the validity of the assumption. The requirements of judicial deference to legislative recognition of constitutional rights cannot be thought to run that far. *See, e.g., Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (judicial inquiry must go back of state's testimonial avowal of secular purpose); *Abington School District v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963) (same); *Karen B. v. Treen,* 653 F.2d 897, 900 (5th Cir.1981), *aff'd,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (same). On such a view of things, any persons successful in pressing free exercise (or establishment clause) claims upon a legislature would have the legislature's action yielding to their claims—no matter how unfounded—effectively immunized from constitutional challenge by persons pressing conflicting judicial claims under the other religion clause (or other constitutional provisions).

■ Because we cannot accept this, we disagree with the district court in its expressed view—critical to its decision—that whether the pre-exemption regulations violated the free exercise clause was not in issue in this case. We think it was inescapably put in issue by the state's deliberate reliance upon the actuality or possibility of free exercise violation as the justifying secular purpose for the legislative exemption.

Because it is inescapably in issue, and because its resolution is, we believe, disposi-

tive, we must address it.[9] But when we turn to that issue, we face—as did the district court—a disturbingly meager record upon which to apply free exercise doctrine as shaped by authoritative Supreme Court interpretations (or "noninterpretations") of the clause.

To point up the record deficiencies it is necessary briefly to summarize the relevant free exercise doctrine that would have determined, in a head-on adversarial clash between sectarian centers and the state, whether and to what extent free exercise rights were actually burdened, or even threatened with burden, by the state's pre-exemption regulatory scheme.

■ We start with the fundamental proposition that the freedom to act upon religious beliefs—to engage in religious activity—is not absolute, as is the right to hold those beliefs; activity may be curtailed in some circumstances for the protection of sufficiently compelling societal interests. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Whether state law impinges at all upon free exercise rights first depends upon whether "the purpose or effect of [the] law is to impede the observance of . . . religion[ ]." *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). Whether, in turn, the holding or active expression of particular beliefs involves the observance of "religion" depends upon the sincerity of the beliefs held and the centrality of those beliefs to an identifiable religious faith or commitment; only those laws that impede the holding or active expression of sufficiently sincere and central religious beliefs impinge upon free exercise rights. *See Wisconsin v. Yoder,* 406 U.S. 205, 215–19, 92 S.Ct. 1526, 1533–35, 32 L.Ed.2d 15 (1972). If, under these tests, a particular law does impede "religious" ac-

---

9. Because we find the "secular purpose" prong of the *Lemon v. Kurtzman* inquiry not met, we do not reach the primary secular effect and non-entanglement prongs. We observe only that the primary effect of the exemption is obviously the very effect concededly "purposed" by the legislature: to favor religion over nonreligion because of an asserted concern that the accommodation to religion was constitutionally compelled or permitted. The critical inquiry then is whether the asserted "purpose" —directly effectuated—was "clearly secular." If it was not, its primary effect could not be considered secular.

tivity, even indirectly, it violates the free exercise clause, unless the impediment is justified by a compelling state interest arising from some substantial threat to public health, safety, peace, or order, *see Yoder,* 406 U.S. at 221–29, 92 S.Ct. at 1536–40; *Sherbert,* 374 U.S. at 403, 83 S.Ct. at 1793, and is the least restrictive means for protecting the compelling state interest, *id.* at 406, 83 S.Ct. at 1795.

■■■ Where free exercise rights, as measured by these tests, exist, the state is constitutionally obligated to accommodate them, even if this entails some degree of disparate treatment of religious activity; by definition, constitutionally compelled accommodation of free exercise rights cannot abridge the establishment clause. *Yoder,* 406 U.S. 235 n. 22, 92 S.Ct. at 1543 n. 22; *Sherbert,* 374 U.S. at 409, 83 S.Ct. at 1796. And, indeed, to provide the necessary "play in the joints productive of a benevolent neutrality," *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1969), the range of permissible state accommodation to free exercise rights runs beyond that constitutionally compelled—out to limits ultimately imposed by the establishment clause. *Id.* at 673, 90 S.Ct. at 1413. Where those limits of permissible accommodation lie in a particular case involves a "value judgment" guided only by historical inquiry and prior authoritative judicial decisions. *Id.* at 669, 90 S.Ct. at 1411.

■■■ All this being so, we cannot question the appropriateness of the state's seeking to defend the challenged exemption here on the basis that the accommodation it makes to the activities of "religious institutions" was constitutionally compelled or at least constitutionally permitted by reason of the existence of free exercise rights in those institutions, and that this provided a saving "secular purpose" for the exemption under establishment clause challenge. Protection of constitutional rights can properly be advanced by government as justification for governmental action that is under challenge for violation of other constitutional rights. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (protection of establishment clause rights recognized, though rejected on merits, as cognizable "compelling state interest" defense to free speech challenge). We do not suppose that a court in which such a justification issue is raised is without power to adjudicate it notwithstanding the absence as parties of those persons in behalf of whose free exercise rights the legislative accommodation was allegedly made. *See* Fed.R.Civ.P. 19(b) (criteria for "indispensability" of parties). It is obvious, on the other hand, that fair and complete disposition of the difficult religion clause issues raised in this case would have been greatly aided by the presence of those persons as parties. *See* Fed.R.Civ.P. 19(a) (criteria for "conditionally necessary" parties). A moment's reflection and a summary review of the evidence marshaled for the court by the parties on their cross-motions for summary judgment will make this plain.

■■■ The plaintiffs had to do no more than hold up the challenged exemption for judicial scrutiny to demonstrate its palpable facial non-neutrality in respect of religion; the exempted activities are, by definition, only those of "religious institutions" and the substantiality of the degree of favor conferred upon religion in relation to nonreligion is equally palpable.[10] This clearly

---

10. To emphasize the substantiality of the relative favor shown religious institutions by this exemption, we summarize the post-exemption situations of the sectarian and nonsectarian child care centers in relation to the state's regulatory scheme.

The only substantive requirements imposed equally on the two classes of centers under the total scheme are that both must, of course, continue to comply with all otherwise applicable general laws and regulations regarding food service activities, health and sanitation, water supply, and building and fire codes (a compulsion clearly present outside and independently of this regulatory scheme); and meet the same minimum staff-child ratios (the only equally applicable standard integral to the post-exemption regulatory scheme).

Beyond this, the nonsectarian centers alone must comply with a substantial range of other requirements: *inter alia,* to serve meals to their patrons and meet certain nutritional criteria; to supply cots and cribs for the children's rest periods; to provide individual storage space for

distinguished the challenge in this case from those in cases such as *Mueller v. Allen,* —— U.S. ——, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), and *Walz,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1969), where the establishment clause challenges were to legislation that on its face equally favored both nonsectarian and sectarian interests, the claim being that it was nevertheless impermissible under the Establishment Clause so to favor the sectarian interests. Importantly, in each of those cases the secular purpose advanced as justification for the legislation applied broadly and equally to nonsectarian as well as sectarian interests and had to do with the intrinsic value, from society's viewpoint, of the religiously neutral conduct being encouraged, aided, or relieved of burden by the legislation. *See Mueller,* —— U.S. at ——, 103 S.Ct. at 3066 (aid to elementary and secondary education); *Walz,* 397 U.S. at 672, 90 S.Ct. at 1413 ("moral or mental improvement of community at large"). It is this very breadth of coverage and focus upon societal values not peculiarly the domain of religion that has allowed the Supreme Court in those cases to find the animating purpose of the legislation to be "secular," and the legislation to be "benevolently neutral" both in purpose and in nonentangling primary effect. *See Mueller,* —— U.S. at ——, 103 S.Ct. at 3067 (upholding tax deduction "assuring the continued financial health of private schools, both sectarian and nonsectarian"); *Walz,* 397 U.S. at 673, 90 S.Ct. at 1413 (upholding tax exemption to all "houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations").

By contrast, the challenged exemption here is expressly designed only to benefit "religious institutions," and the legislative purpose avowed for it has expressly to do only with religious values. It is for this reason, of course, that the state has per-force here rested its claim of justification—of secular purpose—solely on the existence of free exercise rights, identifying the protection of those indisputably religious interests as the "secular" purpose of the exemption.

■ On the parties' cross-motions for summary judgment, we therefore hold that the state had the burden of demonstrating the existence, as a matter of law, of free exercise rights justifying the exemption on this basis. If it failed to carry that burden, it could not properly be awarded summary judgment, *see* Fed.R.Civ.P. 56(c), though its failure to do so need not on the other hand compel judgment for the plaintiffs on their cross-motion—a matter to which we will return.

This burden could only be carried by a demonstration beyond factual dispute that the previously regulated but now exempted activities expressed sufficiently central and sincerely held religious beliefs to permit the full sweep of free exercise protections provided by the exemption. While, as noted, evidence to this effect might best have come from persons directly claiming the free exercise rights—as in free exercise litigation it typically has come—it of course lay with the state as defendant to marshal the requisite evidence from whatever sources it chose, including the testimony of exempted institutions or any favorable evidence marshaled by plaintiffs, or indeed to contend that free exercise rights were manifest as a matter of law in the very nature of the exempted activities.

■ But when we look to the totality of the evidence marshaled and to the activities exempted from former regulation, it simply cannot be held that this burden was carried. In the first place it could not be thought carried on the basis that *all* activities, or at least all "good works" activities, of conced-

---

the personal effects of each child; to meet minimum space requirements, with the square-foot-per-child requirement differing for eating, play and sleeping areas; to maintain *two* staff people on duty at all times (while the sectarian centers can at times have only one); to meet administrative and organizational requirements including personnel qualifications in several respects; to keep records on each child; to provide first aid kits and separate isolation rooms for sick children; and to maintain liability insurance at a certain level and to comply with program guidelines, including certain restrictions on disciplinary practices.

edly religious institutions, are *per se* "religious," hence entitled to free exercise protections. This simply is not the law.[11] *See Walz,* 397 U.S. at 674, 90 S.Ct. at 1414. The rule instead is that some activities of undoubtedly "religious" institutions may fall completely outside the realm of protected "religion," notwithstanding their undoubted legitimacy or manifest social virtue, *see, e.g., De La Salle Institute v. United States,* 195 F.Supp. 891 (N.D.Cal.1961) (operation of winery). Neither, obviously, does the whole sweep of exempt activities here lie so manifestly at the core of religious practices—such as prayer, worship, and ritual—as to be entitled *per se* to protection.

These possibilities aside, the existence of free exercise rights justifying the full sweep of legislative protection afforded by the exemption here could only have been demonstrated by evidence—historical, ecclesiastical, and other—that sufficiently related the particular activities exempted to sincerely and centrally held religious beliefs of the sectarian sponsors of child care centers.

The record is simply devoid of evidence from which any such specific relationship between beliefs and conduct could have been found to exist across the range of the now-exempted activities.[12] Indeed, the state was content to present evidence that tended merely to demonstrate the impetus for the legislature's action upon an avowed secular purpose to accommodate.[13] That evidence simply did not go at all to the underlying issue respecting the existence of protectible free exercise rights, except to the extent of showing that some persons had asserted their existence.[14]

■ Not only was the evidence insufficient to demonstrate the existence of free exercise rights across the entire range of

**11.** Indeed, it seems likely that the exempted religious institutions here would make no such ultimate claim in view of their failure, so far as we are aware, to challenge the few remaining areas of modest state regulation to which they are subjected.

**12.** The most directly pertinent evidence respecting any such relationship in fact tends to negate any relationship. An affidavit of the Director of the Licensing Division of the Department of Welfare stated that in a conference with an attorney for church sponsored centers the attorney "stated that requiring a license as a condition for operating a child care center interfered with the church's ministry, [but] he did not contend that any particular provision of the licensing standards conflicted with the center's free exercise of its religious beliefs." J.A. 153.

**13.** The principal evidence of legislative purpose offered by the state was an affidavit of the defendant Commissioner of Welfare which asserted that a number of the church operated centers had opined to him that "the requirement of licensure of their respective facilities and programs ... was a violation of their rights guaranteed by the First Amendment" and that these complaints prompted a state legislator to introduce legislation "on behalf of these churches to exempt them from licensure requirements." J.A. 131.

**14.** Indeed, even if the true issue were only whether the legislature acted on a justifiable assumption that free exercise rights *arguably* required accommodation to the degree made (the issue perhaps identified as dispositive by the district court, *see* Part I, *supra*), the evidence on that point was by no means undisputed. Against the state's mere evidence that complaints made by churches had prompted introduction of the exemption legislation, the plaintiffs offered evidence that the state's attorney general had rendered an official opinion at the legislature's request to the effect that the pre-exemption regulations violated no rights under the free exercise or establishment clauses. That opinion, given before the exemption's enactment, read, in pertinent part:

The Welfare Department's child-care center standards are reasonable and permissible regulations to protect the health, welfare and safety of enrolled children. They do not violate First Amendment rights and are enforceable against centers operated by religious institutions. The regulations are consistent with a valid governmental purpose. After applying the tests for determining possible violations of the Establishment Clause or the Free Exercise Clause, I have found no instance of an impact on religious belief and practice such as to negate these regulations of general application.

Of course, as we have indicated, we do not think that the dispositive issue on the summary judgment motion was simply whether, as the state now seems to assert, and the district court seems to have ruled, the legislature acted in a good faith belief that it could permissibly act as it did in order to avoid any possibility of violating such free exercise rights as might exist and, in any event, to avoid litigation asserting those rights.

exempted activities, it actually demonstrated the converse—that some at least of the exempted activities were not entitled as a matter of law to free exercise protections. For purposes of our review it suffices to identify only the most obvious. On no possible view could the requirement that child care centers contain a minimum area of space per child, that they provide suitably spaced and covered cots and cribs, and that they provide nutritious meals, be held to impinge upon any currently known or practiced religious beliefs under free exercise protection. At least these areas of conduct (and arguably many of the other areas formerly subject to general regulation but now exempted from regulation in the sectarian center operations) are manifestly and properly concerned only with the health, safety and welfare of the children in the child care centers.

■ This being so, it is not necessary to decide whether some of the exempted operations may have been entitled to free exercise protection. On the summary judgment ruling we review, it suffices to hold that the defendant has failed to demonstrate beyond factual dispute that the entire range of exempted operations were so entitled. The exemption, on its face, and as a matter of law was overbroad in relation to the secular legislative purpose claimed for it.[15] *See King's Garden v. FCC,* 498 F.2d 51, 54–55 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). The defendant was therefore not entitled to summary judgment. Fed.R.Civ.P. 56(c).

The question then arises whether, as plaintiffs assert, they were entitled to summary judgment on their cross-motion. More precisely, the question is whether upon a summary judgment record demonstrating some degree of overbreadth of the challenged exemption in relation to its avowed secular purpose of accommodating free exercise rights, the plaintiffs are entitled to a summary judgment that, as written, the exemption is unconstitutional.

■ We believe that such a declaration would technically be warranted here without any necessity on the plaintiffs' part to demonstrate, or on the court's part to determine, the precise extent of overbreadth. That is to say, we do not believe it is incumbent either upon a party challenging such legislation or upon a court entertaining such a challenge to "blue pencil" the legislation in order to square it with the constitutional provision invoked to challenge it. The judicial function in such cases may best be served by a simple declaration that, as they stand, the two do not perfectly square, so that the legislation as it stands must perforce fall. *See United States v. Butler,* 297 U.S. 1, 62, 56 S.Ct. 312, 317, 80 L.Ed. 477 (1936); *see also* W. Van Alstyne, *Interpreting This Constitution: The Unhelpful Contributions of Special Theories of Judicial Review,* 35 Fla.L.Rev. 209 (1983) (extolling virtues of limited, procedurally constrained constitutional review). By this means any revision thought needed to

---

**15.** It is also arguably overbroad in its inclusion of all "religious institutions" in the exempt category. As the record indicates, J.A. 119, and as the *amicus* brief of the Virginia Council of Churches forcefully emphasizes, a significant number of the facially exempted sectarian sponsors have expressly disclaimed any felt entitlement to exemption or any felt burden upon their free exercise rights under the pre-exemption regulations. This attitude was known to the legislature at the time the exemption was under consideration, *id.,* and posed an obvious dilemma for that body. Any attempt to limit the exemption to only those religious institutions that might be expected to challenge the extant regulations would have posed flagrant dangers of facially favoring "one religion over another." The legislature's attempted solution was to exempt all and then give any

exempted institution the right nevertheless to opt for licensure and full regulation along with the nonsectarian operators. Va.Code § 63.1–196.3 D. The awkward—if not cruel—Hobson's choice thereby imposed upon sectarian sponsors forced to choose between relinquishment of an unsought but gratuitously conferred competitive advantage over their nonsectarian counterparts and the maintenance of religious and constitutional principles at odds with those of their other sectarian counterparts may well involve still another basis for constitutional challenge. The potential that this device posed for exacerbation by the state of religious differences among the sectarian operators is obvious, and may well involve quite another set of "entanglement" problems for the exemption as presently structured.

square the two is left to the legislature so far as the statute is concerned, or to the people so far as the Constitution is concerned. And that, in the ordinary case, is arguably where—in faithfulness to separation of powers concerns—the squaring functions should be left or at least first exercised.

But this general principle—even if it be accepted as ordinarily the wise one—has its exceptions. In some situations it may of course be necessary or at least prudent for the courts to do the necessary squaring of statute with Constitution by excising only the unconstitutional portions of legislation not wholly unconstitutional.[16]

That course is indicated as the proper one here. If we were to declare the exemption unconstitutionally overbroad as written, the likelihood that effective legislative revision without further judicial involvement would occur seems rather remote. The greater—or at least equal—likelihood would seem a belated free exercise challenge by at least some of the exempted "religious institutions"—either to the wholly restored legislative regulatory scheme or to any later revised version that did not make an approximately equal accommodation to that of the exemption successfully challenged here.

As we have indicated at several points, such a direct free exercise challenge by the sectarian institutions would provide a much surer basis than does the present lawsuit for judicial determination of the constitutionally permissible extent of state accommodation. But this would mean two (or more) lawsuits to force a final squaring of the legislative regulatory scheme with the difficult cross-demands of the religion clauses. With the fat already so far in the judicial fire, a better solution to a problem that almost certainly will not go away short of ultimate judicial resolution would be to encourage that resolution in the present lawsuit.

This may be done here if the summary adjudication of unconstitutionality for over-

breadth that we find justified on the present record is nevertheless conditionally denied, and if the persons whose free exercise rights are centrally in issue in this action are now added as parties to further proceedings in it. Both of these may properly be done under traditional procedures.

■ Even where summary judgment is appropriate on the record so far made in a case, a court may properly decline, for a variety of reasons, to grant it. *See generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2728 (1983). We think this is such a case, for reasons earlier suggested.

■ A declaration of unconstitutionality for overbreadth would not finally conclude the underlying, conflicting claims of the primary parties in interest in this litigation. Such a declaration would not by its terms, nor could it, preclude subsequent challenges by any of the presently exempted "religious institutions"—nonparties to this litigation—to all or any portions of the restored general regulatory scheme, or any legislatively revised version. Nor could such a declaration prevent a series of piecemeal challenges and counter-challenges by the affected sectarian and nonsectarian institutions to successive legislative attempts to accommodate their conflicting religion clause claims. In other words, summary adjudication on so limited a basis of issue and party preclusion and on so inadequate a factual record, *see Williams v. Howard Johnson's Inc.*, 323 F.2d 102, 105 (4th Cir.1963), is likely to be inconclusive of the underlying rights in issue, including those of the prevailing plaintiffs.

If, on the other hand, the action is remanded for further evidentiary proceedings with all the most directly affected parties in interest—the nonsectarian and sectarian child care center operators along with the state—those parties can fully develop their opposing legal and factual positions and a definitive resolution of their conflicting religion clause claims and defenses can be achieved in this litigation. We think the

---

**16.** By this we do not express any opinion as to whether portions of the statutory exemption may be found constitutional upon more com-

plete inquiry. We simply recognize that as a possibility.

sectarian operators who claim entitlement to free exercise protection should be parties to this action—for reasons already adequately explained. Indeed, they appear, on our analysis of the issues in this case, to be "conditionally necessary" parties under the criteria of Fed.R.Civ.P. 19(a).

Under the circumstances that have developed, however, the decision whether the sectarian operators should at this late stage be made parties should be left to them. If they desire to intervene as a class [17] under Fed.R.Civ.P. 23(b)(3) and if the numerosity and other requirements of the class action rule can be met, they should be permitted to intervene as of right. Fed.R.Civ.P. 24(a)(2). A fair opportunity to intervene can be provided them upon remand. If they decline then to intervene, or if intervention as a class is found infeasible, summary judgment for the plaintiffs should follow, on the basis that the exemption as now written is unconstitutionally overbroad under the establishment clause.

Upon intervention of the sectarian operators as a class, further evidentiary proceedings may be devoted to developing—under applicable substantive doctrine and appropriately allocated burdens of proof, see Part II, supra—the extent of any free exercise rights had by the sectarian institutions in the exempted activities, and the nature and extent of any compelling state interest in nevertheless regulating those activities. This will provide a basis—not now provided—for a properly informed "value judgment" by the court of the constitutionally permissible extent, under establishment clause constraints, of the accommodation to free exercise rights made in the challenged exemption.[18]

In developing such a record, the initial burden of production should be upon the sectarian institution intervenors to establish the extent, if any, of their free exercise rights in the exempted activities. If they should fail, under relevant constitutional doctrine, to establish the existence of any such rights, the exemption should be declared wholly unconstitutional. If, however, the intervenors establish the existence of free exercise rights in any of the exempted activities, it should then lie with the plaintiffs to establish the existence of a compelling state interest that nevertheless justified regulation of those free exercise activities.[19] The court may then proceed to exercise an informed "value judgment" in defining the line of permissible state accommodation—allowing sufficient "free play in the joints"—to any free exercise rights found to have existed.

**17.** We do not believe that the goal of achieving a substantially conclusive resolution of the underlying issues and of concluding all parties in interest can properly be obtained except by means of class intervention. Individual interventions in numbers too small to meet the numerosity requirement, or on the basis of non-common issues too great in number to meet the commonality of issues requirement, would not serve the purpose sought in further proceedings.

Whether the class action criteria are met by those sectarian operators who indicate a desire so to intervene must, of course, be left to the district court.

**18.** This will concededly involve line-drawing between "religious" and "secular" activities of the sectarian child care center operations that the district court thought were not constitutionally required, either by the legislature or by the court. While we recognize the difficulty, we are persuaded, and hold that the effort must and can reasonably be made. See generally Esbeck, State Regulation of Social Service Ministries of Religious Organizations, 16 Val.U.L.

Rev. 1, 4–11 (1981) (judicial criteria for line-drawing).

Neither that line nor the resulting limit of permissible state accommodation to free exercise rights need—or can—be drawn with bright-line precision. The legislature must in fact be allowed some range of accommodation beyond that constitutionally compelled by free exercise rights. See Part II, supra. But establishing the permissible range requires for its benchmark a general identification of those activities that are "religious" and those that are not under free exercise doctrine. While, as the district court perceptively put it, the state is not required to "walk[ ] a tightrope between the establishment clause and the free exercise clause," J.A. 187, it is required, and the courts in judicial review also, to make an informed value judgment that does more than merely placate potential free exercise challengers by granting practically unlimited accommodation in order to avoid any challenge.

**19.** Of course, showing a compelling state interest should lie with the state as well, and an opportunity should be afforded the state to do

## III

The district court's grant of summary judgment to defendants is vacated. The district court's denial of plaintiffs' cross-motion for summary judgment is affirmed, subject to the condition hereafter expressed. The action is remanded to the district court for further proceedings in accordance with this opinion and the following specific directions.

The district court shall give notice by any practicable means to those religious institutions whose operation of child care centers is exempted from regulation by § 63.1–196.3 of their right to intervene as a class in this action if so disposed. The notice shall state the general basis for and conditions of the intervention as expressed in this opinion; shall give a reasonable period for exercise of the right to intervene; shall provide that any religious institution notified may file a specific refusal to be included in any class certified; and shall indicate that if intervention is declined, summary judgment for the plaintiffs will forthwith be entered declaring the exemption provided by § 63.-1–196.3 unconstitutional and of no effect.

Upon request of the court, the defendant shall provide the names and addresses of those institutions considered by the state to be exempted from regulation by § 63.1–196.3. The expense of preparing and delivering the intervention-right notices shall be borne by the defendant as a cost of this litigation.

If class intervention is permitted under the conditions here expressed, the interve-nors shall be aligned as additional parties-defendant. So far as practicable, the class shall be defined expressly to exclude any sectarian institution which specifically has declined to be included within the class proposed for intervention.

If, for any reason, class intervention as herein authorized is not consummated, the district court shall forthwith enter judgment declaring Va.Code § 63.1–196.3 unconstitutional, for reasons expressed in the opinion of this court, under the first amendment to the Constitution of the United States.[20]

The costs of this appeal shall be borne by defendants.

SO ORDERED.

---

so. In view of the state's litigation posture to this point, however, the plaintiffs must be allowed to assert the existence of such a compelling state interest, notwithstanding the state's litigation position. The state's interest is obviously that one asserted in the original regulatory design which reached all child care centers equally. The plaintiffs must be free to assert that so long as that interest is asserted through regulation of nonsectarian centers, the same interest must exist as a sufficiently compelling one to justify minimally intrusive regulation even of those sectarian child care operations found sufficiently "religious" to come under free exercise protection, see Part II, supra; that if the state continues its regulation of non-sec-tarian center operations, it must, under the establishment clause, comparably regulate the sectarian center operations out to the limits defined by the religion clauses.

20. Although plaintiffs prayed additionally for specific injunctive relief compelling the state-defendant to enforce the pre-exemption regulations against all child care center operators, we do not consider that that additional relief is required. We assume that the state will act in compliance with a declaration that the challenged exemption as written is unconstitutional and of no effect.