**SOUTH RIDGE BAPTIST CHURCH,**
Plaintiff–Appellant,

v.

**INDUSTRIAL COMMISSION OF OHIO,**
et al., Defendants–Appellees.

No. 88–3091.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 9, 1988.

Decided Aug. 17, 1990.

Daniel J. Loomis (argued), Cleveland, Ohio, for plaintiff-appellant.

Merl H. Wayman (argued), Columbus, Ohio, for defendants-appellees.

Before WELLFORD and BOGGS, Circuit Judges, and ENGEL,* Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

This case presents the question of whether a state violates the free exercise and establishment clauses of the first amendment, U.S. Const.Amend. I, in compelling a church to pay premiums into a public workers' compensation program on behalf of its employees, where the church believes that such payments are sinful. We ultimately hold that although interesting and delicate, this question has effectively been answered in the negative by the Supreme Court. We accordingly affirm the summary judgment against the church, although on somewhat different reasoning than that below.

Ohio's workers' compensation program, Ohio Rev.Code §§ 4123.01 *et seq.*, is the ordinary public insurance scheme which replaces common law liability of employers to injured employees by insurance benefits from a state-administered fund. The fund and the state's costs in administering it are financed by premiums, payable twice yearly by each employer and assessed according to the number of its employees and the accident risk of the relevant employment. §§ 4123.01, 4123.35(A), 4123.54. Participation in the program is mandatory for all employers of at least one person in the state, §§ 4123.01(B), 4123.35(A), but with two exceptions relevant here. First, "employees" is defined not to include ministers of churches. § 4123.01(A)(2)(a). Second, an employer may elect to self-insure and pay benefits directly to its injured employees, if it can satisfy financial solvency criteria and secure the approval of the Industrial Commission. § 4123.35(B); Ohio Admin. Code § 4121–9–03. The workers' compensation program is administered by appellees Ohio Bureau of Workers' Compensation and the Industrial Commission of Ohio.

Appellant South Ridge Baptist Church is a non-profit religious corporation located in Conneaut, Ohio. In affidavits submitted on its behalf, the Church characterizes itself as "an independent, fundamental, Bible-believing, Bible-teaching and preaching church" which "strive[s] to be absolutely obedient to fundamental doctrines of the Bible and seek[s] to operate and live in accordance with historical Baptist doctrine and marks of the New Testament church.... Foundational to our religious beliefs, we hold as a religious belief that the Bible is the very Word of the living God and is the supreme and final authority in religious faith and practice." Aside from its minister, the Church employs several employees. On the basis of several Biblical verses, the Church believes that to participate in the state's workers' compensation program would be to violate God's command that Jesus is the head of the Church and that its funds are God's, to be spent for Biblical purposes. The Church further believes that it has a Scriptural duty to

* Honorable Albert J. Engel assumed senior status on October 1, 1989.

assist its people who have been injured or fallen ill.

On April 13, 1983, the Bureau notified the Church that it must submit a payroll report and remit premiums to the Bureau. After refusing compliance with the notice and lodging objections with the Bureau, the Church filed a complaint on May 27, 1983 in the United States District Court for the Northern District of Ohio alleging that the Ohio workers' compensation statute violated 42 U.S.C. § 1983 by unconstitutionally infringing the Church's rights under the free exercise and establishment clauses. The Church sought (1) a declaration that the Ohio workers' compensation statute, as applied to the Church and similarly situated churches,[1] violates the free exercise and establishment clauses and analogous provisions of the Ohio Constitution, thereby mandating the Church's exemption from the program;[2] and (2) a corresponding injunction against enforcement of the statute.

Venue was properly transferred to the United States District Court for the Southern District of Ohio on July 1, 1986. On July 31, 1987, defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Considering this a motion for summary judgment, the district court granted defendants' motion on December 28, 1987. 676 F.Supp. 799 (S.D.Ohio 1987). The court rejected the Church's claim that the workers' compensation statutes violated the Church's free exercise rights, holding that compulsory participation in the program promoted the compelling state interests of compensating injured workers and protecting the solvency of the state-wide compensation system. Further, the court held that the scheme was the least restrictive means available for achieving those state interests because Ohio Rev.Code § 4123.35 allows a qualified employer to opt for self-insurance. The Church had never pursued that option. The district court also held that the workers' compensation system's recordkeeping and reporting requirements did not violate the establishment clause of the first amendment by excessively entangling church and state. In granting summary judgment, the court likewise denied class certification. The Church has appealed.

I.

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the stan-

---

1. The proposed class comprises 110 churches out of 7226 religious organizations in the State of Ohio.

2. The Church seeks to be exempted from an obligation to pay premiums to the workers' compensation fund. The Church apparently envisions that its employees would then be ineligible for benefits from the fund, since the Church cites with approval the West Virginia example where churches are exempt from mandatory participation in the workers' compensation program but may choose to participate in the fund and thus secure immunity from common law liability. *See* W.Va.Stat.Ann. §§ 23–2–1(5), 23–2–6 (Michie 1989). Aside from the obvious point that the Church has no authority to speak on behalf of its employees' interests, it is immaterial to our holding whether the employees would continue to be protected by the fund. *See infra* § II.

dard for a directed verdict under Federal Rule of Civil Procedure 50(a).…" *Anderson v. Liberty Lobby, Inc.* [477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)].

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving absence of a material issue of fact, and evidence produced must be viewed in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress Co.,* 398 U.S. 144, 157, 159, 90 S.Ct. 1598, 1608, 1609, 26 L.Ed.2d 142 (1970); *see also Adams v. Union Carbide Corp.,* 737 F.2d 1453 (6th Cir.1984). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510. Summary judgment is improper if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

## II.

█ When determining whether a governmental regulation impermissibly burdens individual rights under the free exercise clause of the first amendment, three factors must be weighed: the magnitude of the burden on defendant's exercise of religion; the existence of a compelling state interest justifying the burden; and the extent to which accommodation of the defendant would impede the state's objectives. *U.S. v. Schmucker,* 815 F.2d 413, 417 (6th Cir.1987) (citing *United States v. Lee,* 455 U.S. 252, 256-60, 102 S.Ct. 1051, 1054-57, 71 L.Ed.2d 127 (1982), and other cases). "The mere fact that the petitioner's religious practice is burdened by a governmental program does not mean that an exemption accommodating his practice must be granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving a compelling state interest," *Thomas v. Review Board, Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981), that is to say, "that it is essential to accomplish an overriding governmental interest." *Lee,* 455 U.S. at 257-58, 102 S.Ct. at 1055-56 (citing *Thomas* and other cases); *see also Hobbie v. Unemployment Appeals Commission of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Whether the state has made this showing depends on a comparison of "the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Schmucker,* 815 F.2d at 417.

In the present case, the Bureau does not contest the sincerity of religious grounding of the Church's belief that its funds are God's alone and should be used according to God's wishes; that God commands them to use the funds to further the Church's various ministries; and that to use some of the funds to pay mandatory premiums into the state workers' compensation fund instead would be sinful. The Bureau likewise does not contest on appeal the district court's sound conclusion that the mandatory participation burdens the Church's free exercise of religion. For its part, the Church concedes that the workers' compensation program advances a compelling state interest in protecting workers and their dependents against costs of workplace accidents. The district court so held. The Church's sole complaint on appeal regarding its free exercise claim is that the lower court erred by granting summary judgment to the defendants when they had failed to prove as a matter of law that mandatory participation of all employers, including churches, was the least restrictive means towards that compelling interest.

In *United States v. Lee, supra,* the Supreme Court decided a case directly relevant to the present one, and an extensive review of that case is warranted. There, an Amish employer who objected on religious grounds to receipt of public insurance benefits and payment of taxes in sup-

port of such benefits asserted that being forced to pay the federal social security tax on behalf of his employees violated his free exercise rights. In analyzing the claim, the Court held initially that the plaintiff's beliefs must be accepted as sincere and that compulsory contribution to the social security system does indeed interfere with these beliefs. 455 U.S. at 256–57, 102 S.Ct. at 1054–55. "[T]his conclusion ... is only the beginning, however, and not the end of the inquiry.... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." 455 U.S. at 257–58, 102 S.Ct. at 1055–56 (citing *Thomas* and other cases). Noting that the program serves important public welfare interests and that "mandatory participation is indispensable to the fiscal vitality of the social security system," the Court next concluded that "the Government's interest in assuring mandatory and continuous participation in and contribution to the social security system is very high." 455 U.S. at 258–59, 102 S.Ct. at 1055–56.

Turning to the final inquiry of "whether accommodating the ... [religious] belief will unduly interfere with fulfillment of the governmental interest," 455 U.S. at 259, 102 S.Ct. at 1056, the Court stated:

> Unlike the situation presented in *Wisconsin v. Yoder,* ... it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs.... The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief. Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.
>
> Congress has accommodated, to the extent compatible with a comprehensive national program, the practices of those who believe it a violation of their faith to participate in the social security system. In [26 U.S.C.] § 1402(g) Congress granted an exemption, on religious grounds, to

self-employed Amish and others. Confining the § 1402(g) exemption to the self-employed provided for a narrow category which was readily identifiable. Self-employed persons in a religious community having its own "welfare" system are distinguishable from the generality of wage earners employed by others.

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees. Congress drew a line in § 1402(g), exempting the self-employed Amish but not all persons working for an Amish employer. The tax imposed on employers to support the social security system must be uniformly applicable to all, except as Congress provides explicitly otherwise.

455 U.S. at 259–61, 102 S.Ct. at 1056–57 (citations and footnotes omitted). Compulsory tax payment by all employers, including religious objectors, was thus justified as "essential to accomplish an overriding governmental interest." 455 U.S. at 257–58, 102 S.Ct. at 1055–56.

Recognizing *Lee*, our circuit has held that "the Supreme Court has stated that the government's interest in revenue-raising statutes is sufficiently compelling to outweigh the free exercise rights of those who find the statute offensive to their religion." *Nelson v. United States,* 796 F.2d 164, 168 (6th Cir.1986). Accordingly, we denied the free exercise claim of a Quaker who had been penalized for filing a frivolous income tax return because she had claimed a "war tax deduction" due to her religious beliefs against the federal government's use of tax revenues in part for

military purposes. *Id. Accord Collett v. United States*, 781 F.2d 53, 54 (6th Cir. 1985) (*Lee* establishes that "[a] religious belief or moral belief in conflict with the payment of taxes affords no basis for resisting the tax."); *see also Graves v. Comm'r of Internal Revenue*, 579 F.2d 392, 393 (6th Cir.1978) (in a pre-*Lee* case, holding that requirement that pacifist Quaker pay income tax which Congress chooses to spend in part for military purposes does not violate the free exercise clause, since the income tax is "neutral as to religion, ... levied uniformly amongst persons of various beliefs, and those of no belief.").

■ We find ourselves unable to distinguish in any meaningful way the issues in this case from the rationale of *Lee*. Just as the Supreme Court determined in *Lee*, so do we hold that payment of taxes in support of a public insurance program interferes with the Church's free exercise of its religious beliefs. Likewise, just as the Court found the federal government's interest in maintaining the fiscal vitality of its old age and unemployment benefits system through mandatory participation to be "very high," we have no hesitancy in holding Ohio's interest in the solvency of its workers' compensation fund to be of an equally high order. In fact, the state's interest is at least as great since it is based on the state's fundamental police power to safeguard the welfare of its citizens. The federal government, of course, is a creature of the Constitution and enjoys no such inherent power.

In the decisive final inquiry as to whether accommodation of the impaired belief unduly interferes with the governmental purpose, South Ridge Baptist argues that protesting churches might be exempted from the program. This is the same argument rejected in *Lee*. The Court there concluded that mandatory participation in the public welfare tax scheme was "essential to accomplish an overriding governmental interest." 455 U.S. at 257–58, 102 S.Ct. at 1055–56. That the taxpayer here is a church instead of an individual believer is not a meaningful distinction between this

case and *Lee*. *See Bethel Baptist Church v. United States*, 822 F.2d 1334, 1339 (3d Cir.1987) (holding that *Lee* controls in a substantially identical social security tax case involving a church employer-taxpayer). Accordingly, because the circumstances of the present case are substantially identical to those in *Lee*, we too conclude that mandatory participation in the Ohio workers' compensation program does not violate the church's free exercise rights.

As noted above, the district court in this case identified two compelling state interests in mandatory participation in the workers' compensation program: keeping the fund solvent, and also protecting workers and their dependents. Although the district court and the parties on appeal conducted a comprehensive inquiry into whether mandatory participation was the "least restrictive means" to achieve these interests, *Lee* dispatches South Ridge Baptist's free exercise claim on the basis of the solvency interest alone. By citing *Thomas* in stating that a restriction on religious liberty must be "essential" to the compelling government interest, the Court in *Lee* appears to have implicitly incorporated the "least restrictive means" test into its holding that mandatory payment of the tax does not violate the free exercise clause. For this reason, we find unavailing the Church's arguments that the church exemption in Ohio's unemployment compensation program and a church exemption from the workers' compensation program of at least one other state indicate that as such an exemption in the Ohio workers' compensation program is a feasible and thus constitutionally required "least restrictive means."

Closely related to the Church's misunderstanding of the "least restrictive means" requirement in this context is the Church's further failure to appreciate *Lee*'s teaching that accommodation of religious objections to taxation is a legislative task. The Court in *Lee* made plain that it would not second-guess legislative decisions regarding how far to accommodate religious objections to its compelling purpose in raising revenue for its programs. "The fact that Congress has already crafted some ... exemptions in

the [tax] Code also is of no consequence, for the guiding principle is that a tax 'must be uniformly applicable to all, except as *Congress* provides explicitly otherwise.'" *Hernandez v. Comm'r of Internal Revenue,* —— U.S. ——, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989) (quoting *Lee;* emphasis in *Hernandez*). Thus, contrary to the Church's arguments, the exemption of ministers from the definition of "employees" for whom an employer must pay workers' compensation premiums does not undercut the state's compelling interest in mandatory employer participation. Here, the minister exemption closely parallels Congress' exemption in the social security statute of the "narrow" and "readily identifiable" category of "[s]elf-employed persons in a religious community having its own 'welfare' system." 455 U.S. at 261, 102 S.Ct. at 1057. Neither exemption "operates to impose the employer's religious faith on the employee[ ]." *Id.* The same need not be true if Ohio's exemption extended to all employees of a church employer.[3] Likewise, the fact that Ohio allows a limited exemption from the program for employers who qualify and choose to self-insure does not diminish the state's compelling interest in the fund's solvency. The limited and regulated self-insurance option fully secures the state's interest in protecting its workers; it could be expected that a blanket exemption of churches would not. More importantly, however, decisions regarding the coverage of a tax program are properly for the legislative branch. *Cf. Mozert v. Hawkins County Bd. of Education,* 827 F.2d 1058, 1079–80 (6th Cir. 1987) (Boggs, J., concurring) (plaintiffs' constitutional challenge to the content of school curricula is "a challenge to the notion of a politically-controlled school system," with which the Supreme Court has almost never interfered).

In sum, then, the political resolutions achieved in accommodating religious interests in the Ohio workers' compensation program by extending certain exemptions and withholding others cannot be compared to similar choices in other Ohio public benefit programs and in workers' compensation programs of other states. It is left to the respective legislatures to determine whether the state's compelling interest in the fiscal vitality of these programs and the underlying societal purposes would be compromised by certain selective exemptions.[4] We decline to adopt a simple and absolute "least common denominator" approach to the first amendment which fails to acknowledge that different programs within a state and similar programs in other states may have differing statutory objectives. *See New Life Baptist Church Academy v. Town of East Longmeadow,* 885 F.2d 940, 949 (1st Cir.1989) (noting different educational standards among various states in assessing a free exercise challenge to state procedures for determining the adequacy of secular education in sectarian schools), *cert. den.,* —— U.S. ——, 110 S.Ct. 1782, 108 L.Ed.2d 784 (1990); *cf. Martin v. Ohio,* 480 U.S. 228, 236, 107 S.Ct. 1098, 1103, 94 L.Ed.2d 267 (1987) (in rejecting due process challenge to state criminal procedure, the Court stated that "the question of whether ... [a State] is in violation of the Constitution ... is not answered by cataloging the practices of other States.").

Decisions of other circuits addressing similar free exercise claims support our holding in this case. In *Bethel Baptist Church v. United States,* 822 F.2d 1334, 1338–39 (3d Cir.1987), the Third Circuit held that a church may not assert a religious objection to public insurance to avoid paying social security taxes for its employees. The court in *Varga v. United States,* 467 F.Supp. 1113 (D.Md.1979), *aff'd,* 618 F.2d 106 (4th Cir.1980) (table), rejected a similar claim by a self-employed individual who objected to paying social security tax-

---

**3.** We need not decide if the free exercise clause compels Ohio to exempt ministers. *See Lee,* 455 U.S. at 260 n. 11, 102 S.Ct. at 1057 n. 11. The point is that the Ohio legislature has made a significant and reasonably limited effort to accommodate the practices of those who believe it

sinful to participate in public insurance programs.

**4.** We note here that since 1982, the Ohio legislature has at least twice declined to pass bills to exempt churches from the workers' compensation program. *See* Appellee's Brief at 15.

es when his religious beliefs prevented him from accepting the program's benefits. 467 F.Supp. at 1118. Also, an Ohio state court has considered and rejected a first amendment claim against the state workers' compensation tax identical to the claim at issue here. *Victory Baptist Temple v. Industrial Comm'n,* 2 Ohio App.3d 418, 442 N.E.2d 819 (1982), *cert. den.,* Ohio Case No. 82–768 (June 30, 1982), *cert. den.,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982).

### III.

■ To survive an establishment clause challenge, a statute must have a secular legislative purpose; the principal or primary effect of the statute must be one that neither advances nor inhibits religion; and the statute must not foster excessive entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971). Plaintiff alleges that the administrative oversight necessary to administer the workers' compensation program creates an excessive entanglement which violates the establishment clause. The Church alleges excessive entanglement based upon: (1) inspection of church records; (2) forced disbursement of funds to a state program; (3) record-keeping and reporting; (4) categorizing employees according to risk; and (5) enforcement action for non-payment of premiums.

Ohio Rev.Code § 4123.23 requires that payroll and wage expenditures be open for inspection; section 4123.28 requires reporting of job-related injuries or illnesses; section 4123.26 requires reporting aggregate wages and number of employees. Mr. John Linzinmeir, the Assistant Director of Auditing/Underwriting for the Bureau of Workers' Compensation, stated in an affidavit submitted with the summary judgment motion that payroll reports are sent to employers every six months and must be completed and returned, with the employer being responsible for calculating the premium due; that audits are conducted whenever requested by the employer or when the employer is in default; that audits and investigations do not seek information about the religious beliefs of the clergy or congregation; and that the Bureau does not seek to interfere with the workings of the church or the school.

The district court's legal analysis and conclusion on this issue is sound, with one exception,[5] and is affirmed. The opinion is further bolstered by intervening holdings of the Supreme Court. *See Jimmy Swaggert Ministries v. Bd. of Equalization,* —— U.S. ——, 110 S.Ct. 688, 698, 107 L.Ed.2d 796 (1990) ("Collection and payment of the [sales tax at issue] will of course require some contact between appellant and the State, but we have held that generally applicable administrative and recordkeeping regulations may be imposed on [a] religious organization without running afoul of the Establishment Clause."), and *Hernandez,* 109 S.Ct. at 2147 ("[R]outine regulatory interaction [such as application of neutral tax laws] which involves no inquiries into religious doctrine, ... no delegation of state power to a religious body, ... and no 'detailed monitoring and close administrative contact' between secular and religious bodies, ... does not of itself violate the nonentanglement command."). It follows from these cases as well that the district court correctly ruled that the Church had presented no valid establishment clause claim here as a matter of law.

\* \* \* \* \* \*

The remarkably successful history of the United States over the last two centuries is undoubtedly due to many factors unique in the long common experience of humankind. However, of exceptional importance has been the tolerance of its institutions and

---

**5.** This court's affirmance of the district court on this issue does not extend to its remark that if the Church were exempted from the workers' compensation program, an injured employee dissatisfied with the Church's charity would have to pursue common law remedies against it in the state courts, "an even more undesirable result from a scriptural standpoint." 676 F.Supp. at 807. Aside from being irrelevant, this determination seems inappropriate. "Courts are not arbiters of scriptural interpretation." *Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431.

citizenry for the thoughts and beliefs of others. The variety of religious thought and expression has been extraordinary, and the freedom of expression and religious worship fostered by the first amendment has brought to the American dream a rich and varied heritage unparalleled elsewhere. While our chief guarantee has been the first amendment, that document alone cannot be entirely self-operating but demands the constant support of a tolerant electorate and a sensitive, healthy, and effective system for self-government. Unless the civil government is free to address and solve the contemporary concerns and necessities of its citizenry, it cannot survive and, in corollary, command the kind of respect and consensus which enables religious toleration and religion itself in its hundreds of variant forms to flourish. This is why, as the Supreme Court recognized in *Yoder*, "even when religiously based, [one's activities] are often subject to regulation by the state in the exercise of their undoubted power to promote the health, safety and general welfare...." 406 U.S. at 220, 92 S.Ct. at 1535. The South Ridge Baptist Church is undoubtedly subject to a variety of state public welfare regulations, from the zoning, building and fire codes applicable to its place of worship, *see, e.g., Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 306–07 (6th Cir.1983) (zoning regulations preventing church from constructing place of worship on its property do not violate the free exercise clause); *Forest Hills Early Learning Center, Inc. v. Lukhard*, 728 F.2d 230, 243–44 (4th Cir.1984) (health and safety regulations applicable to sectarian child care center do not burden free exercise rights), to federal minimum wage and other labor standards governing the Church's employment practices. *See Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 303–05, 105 S.Ct. 1953, 1962–64, 85 L.Ed.2d 278 (1985) (application of the Fair Labor Standards Act to a non-profit religious organization does not violate the free exercise clause). That religious objections to such social ordering are respected does not mean they must be heeded. "[E]very person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs." *Lee*, 455 U.S. at 261, 102 S.Ct. at 1057. We respect the Church's objections to the workers' compensation system and its remarkable devotion to its religious beliefs in every aspect of life. Where such beliefs clash with important state interests in the welfare of others, however, accommodation is not constitutionally mandated.

Undoubtedly many policies and practices of any civil government will from time to time be repugnant to even the best intentioned beliefs of a given group, especially where the government seeks to order a pluralistic society encompassing many ethnic groups and the widest possible variety of religious beliefs, often historically at variance with one another. Undoubtedly such a situation exists here, where the civil government of Ohio and its electorate has deemed it necessary to enact a workers' compensation law of broad application even though it may run afoul of the prevailing dogma of a given church or sect. It is difficult to say that such a law unconstitutionally impacts upon one group, where the burden of the law is spread equally and it does not single out that group for separate or discriminatory treatment. The impact upon the South Ridge Baptist Church of the workman's compensation laws is no different than the impact upon any other employer of individuals in the State of Ohio of the same premium rate class. Under such circumstances the civil government is not required, in our view, to yield its legitimate powers to provide for the general welfare and to accept a diminution of its responsibilities out of deference to the peculiar and particular views of one of many divergent religious or political sects.[6]

AFFIRMED.

6. We note further that nothing to our knowledge compels an employee of the church who entertains similar views as a matter of personal conviction to accept any of the benefits conferred by the workman's compensation law where he or she would otherwise be entitled to them. On the other hand, to preclude some other employee not exercising such belief from

WELLFORD, Circuit Judge, concurring:

I concur with the reasoning and rationale of Judge Engel's opinion. This is a close and troubling case with respect to whether there are any less "restrictive means" to provide workers' compensation coverage for church-related employees than Ohio has taken. Plaintiff has demonstrated none in my view. It may be logical to assume, as argued by plaintiff, that the risk of injury in church-related jobs is less than in business and industry generally, but presumably the Ohio rate system gives a lower rate to those employers with fewer claims. It is a policy decision for the state to permit reasonable exemptions or exceptions from coverage.

Plaintiff has submitted affidavits that it operates a school or academy in conjunction with the church, which Robert B. Woodard, the school's principal, has said is a part of "the Church's day school ministry." We do not know whether employees and teachers in this school are considered "church" employees, but Woodard also serves as a "pastor to the deaf." Deborah Miller, another affiant, says she is a teacher in the academy, a church member, as well as a part of the church's "county home ministry," and has been a part of its "college ministry." Ms. Miller says also that she is "a part of [the plaintiff church's] staff." We have reason, then, to believe that plaintiff operates with a staff larger than might be expected in the usual rural Ohio church.

Ohio's Director of the Actuarial Department submitted an affidavit also indicating that the state has taken in some $39,000,-000 in premiums from the "classification that covers religious organizations such as churches" from 1982 to 1985. During that same period "the State incurred liability" of some $59,000,000 "in compensation and benefits to those injured workers of employers," such as plaintiff. This data indicates a substantial deficit in premiums necessary to cover workers' compensation benefits to church (and related entity) employees. This data demonstrates a strong need that all church employers be included among all other covered employers as premium payers to help with this deficit. (The system as a whole has accumulated a deficit exceeding one billion dollars as of December 31, 1985.)

In addition, Ohio does have a provision in its workers' compensation laws that allows qualified employers to be self-insurers, thus avoiding some of the burdens of reporting to the state as covered employers. There is no indication that this particular church, nor that Christian churches as a class, has been treated differently under the Ohio law than other like employers or any other religious group. Plaintiff apparently did not choose to pursue this option.

I join, therefore, in affirming the district court decision.

BOGGS, Circuit Judge, concurring.

I write separately because I do not believe that every scheme that taxes religious institutions along with other institutions in our society will necessarily pass muster under the free exercise clause. The court rests its opinion predominantly on the social security case of *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Because of the highly diverse and mobile nature of our society, with an individual frequently working for many employers during a working lifetime, and because of the need to maintain actuarial soundness over periods of half a century or more, the social security system represents one of the most compelling justifications for a legislative decision to adopt a uniform system with no exemptions. *Id.* at 258–59, 102 S.Ct. at 1055–56.

Workers' compensation, on the other hand, is essentially a financing system for contractual arrangements between worker and employer. It would not generally in-

the benefits of the Act merely because the Church itself opposes them or prefers to provide for them in a different manner, could not escape the prospective danger of denying that

employee the equal protection of the state's law merely because of the personal religious beliefs of his employer.

terrupt a coherent scheme for the society to do any of the following:

(1) Allow religiously objecting employers to self-insure, thus insuring that they would not be "looted" through excessive premiums for the benefit of secular employers;

(2) Require, either through direct employee purchase, or employer purchase, insurance providing the same benefits as workers' compensation;[1]

(3) Allow employees who wish to work for religiously based enterprises, such as the Church here, to opt out of workers' compensation and take their chances with the tort system, if they so choose.

Of course, as the court has indicated, the state of Ohio does provide the first option, and the church has made no attempt to exercise it. Under these circumstances, the concern expressed by the state, that employers such as the church are money-losers for the state, takes on greater persuasiveness.

The state's figures are, however, not ironclad for the proposition that the plaintiff and similar churches would not be subsidizing the rest of the state. The state's statistics are for an employer class only 62% of which are churches. Of those churches, less than 5% are churches with religious scruples similar to those of plaintiff. It is thus possible that additional fact-finding might develop that there is a good probability that the state wants to force the churches into the system because they are money-makers for the system. However, the plaintiff has submitted no affidavits to that effect.

Finally, the Supreme Court's quite recent decision in *Employment Division, Department of Human Resources of Oregon v. Smith,* —— U.S. ——, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990), indicates that the right of free exercise is limited by the necessity "to comply with a valid and neutral law of general applicability." Despite the Supreme Court's previous jurispru-

dence in cases such as *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court now seems to be moving strongly away from those cases. In *Smith,* Justice Scalia stated for the Court that the *Sherbert* test of "compelling governmental interest" had never really been applied outside the unemployment compensation context, and never successfully applied. *Id.* 110 S.Ct. at 1602.

In the unemployment compensation cases, the states made arguments similar to those here, that the state unemployment compensation funds might be depleted by the withdrawal of tax revenues, but those claims were brushed aside by the Supreme Court. *See, e.g., Sherbert,* 374 U.S. at 407, 83 S.Ct. at 1795; *Thomas v. Review Board,* 450 U.S. 707, 718–19, 723 n. 1, 101 S.Ct. 1425, 1432–32, 1434 n. 1, 67 L.Ed.2d 624 (1981). Certainly, it would be difficult for an objective observer of the problems that could be caused by the exemption sought by plaintiff here (whether those problems be to the state fund or to workers who choose to enter religious employment) to believe that the government interest could meet the standard ringingly set forth in *Sherbert:*

> [o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.

*Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1794 (quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945)).

Since the Supreme Court now appears to have confined the applicability of those words to the rather limited field of unemployment compensation, I must reluctantly concur in the court's opinion.

---

**1.** It would not matter in ultimate compensation or effect whether the employer or employee had to make the purchase. The costs would repre-sent a cost of employment either way. *See e.g.,* R. MILLER, Economics Today at 124 (1973).